|  |  |
|---|---|
| **UNITED STATES DISTRICT COURT** | **EASTERN DISTRICT OF TEXAS** |

UNITED STATES OF AMERICA § 
§ 
*versus* § CASE NO. 9:22-CR-38 
§ 
XAVIER JEREL LEONARD § 

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Pending before the court is Defendant Xavier Jerel Leonard's ("Leonard") Amended Motion to Suppress (#48). The Government filed a response in opposition (#54), and the court referred Leonard's motion to United States Magistrate Judge Christine L. Stetson for consideration and a recommended disposition. On August 28, 2023, Judge Stetson held a hearing on the motion.

On September 15, 2023, Judge Stetson issued her Report and Recommendation (#59) in which she recommends that the court grant Leonard's motion to suppress. Judge Stetson determined that: (1) the existence of probable cause that a crime occurred in Leonard's home was "tenuous," (2) there were no exigent circumstances justifying the warrantless entry into Leonard's home, (3) the good faith exception to the exclusionary rule does not apply in this case, and (4) the suppression of evidence serves the interest of deterring future constitutional violations. Two weeks later, the Government filed its Objections to the Report and Recommendation (#63). Leonard then filed a response to the Government's objections (#64).

Within its objections, the Government does not dispute that the warrantless entry into Leonard's home violated the Fourth Amendment. Rather, the Government asserts that Judge Stetson erred in concluding that the good faith exception to the exclusionary rule should not apply in this case and in failing to address whether the benefits of deterrence outweigh the costs to

society. Accordingly, the court conducted a de novo review of the objections in relation to the parties' filings and the applicable law. 28 U.S.C. § 636(b)(1)(C); Local Rule CR-59(d). After careful consideration, the court finds that Judge Stetson correctly concluded that Leonard's Motion to Suppress should be granted.

Evidence seized pursuant to a search warrant that was itself the product of an illegal search is admissible if two requirements are met:

> (1) the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon*.

*United States v. Holley*, 831 F.3d 322, 326 (5th Cir. 2016) (quoting *United States v. Massi*, 761 F.3d 512, 528 (5th Cir. 2014)); *see United States v. Leon*, 468 U.S. 897, 921-25 (1984). Judge Stetson held that neither of these two requirements was satisfied in this case. The Government, however, objects and contends that Judge Stetson's findings as to both of these requirements are flawed.

First, the Government appears to assert that the officers' conduct was "close enough to the line of validity" because "[a]t the time the[ ] [officers] entered [Leonard's home], there were a lot of unknowns." That is, the officers did not know if Leonard was "a victim of assault (given the scrapes and blood on him and the broken coffee table)" or if "the perpetrator [was] hiding inside [Leonard's home]." Nor did the officers know if "a family member or friend" was inside the home and "in trouble." Nonetheless, with respect to Judge Stetson's finding that the officers' conduct was not "'close enough to the line of validity' that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the

2

warrant was not tainted by unconstitutional conduct," the court concludes that the Government's objections are without merit.  *See Massi*, 761 F.3d at 528.

Throughout the Government's filings (and during the suppression hearing) the justifications for the officers' decision to enter Leonard's home are, at best, scattered and ultimately lacking. Even at this stage, the Government does not specify by what route the officers' conduct approached the line of validity.  In other words, the Government does not indicate whether it believes that the officers' conduct nearly satisfied the emergency-aid exception, that a protective sweep was required, or that some other exigent circumstance existed.  The Government merely asserts that there were "a lot of unknowns" and contends that it was possible that a perpetrator or a family member was inside Leonard's home.  Unknowns, however, fall far short of "strong evidence of [an] objective emergency," *Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018), or "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger," *United States v. Lozano*, No. 21-50391, 2022 WL 2187859, at *1 (5th Cir. June 17, 2022).[1]  Accordingly, the court concurs with Judge Stetson's determination that an objectively reasonable officer preparing the affidavit or executing the warrant in this case would

---

[1] In fact, when Sergeant Kerri Bell ("Bell") recounted the events leading up to entering Leonard's home, she stated that she and Deputy Juan Noyola ("Noyola") "knocked, identified."  (#58, Ex. 1A, 21:55-22:26).  Noyola then stated that "the door was cracked open," and Bell continued, stating "medical emergency, or did somebody hurt him, we don't know."  Bell's statements clarify that, even after the initial search had taken place, the officers had not identified a specific reason for their own entry.  *Id*.

not have believed that the information supporting the warrant was untainted.[2] Indeed, the officers' warrantless entry into Leonard's home falls far short of the line of validity.

Second, the Government avers that "[t]here simply is no evidence that Bell 'knowingly hid or misrepresented' facts in the affidavit supporting the search-warrant application that would make the reviewing magistrate 'unaware of a constitutional violation.'" The Government argues that for each fact Judge Stetson determined that Bell omitted from her affidavit, there is an independent explanation for its exclusion. In response, Leonard contends that, rather than looking at each of Bell's omissions individually, "[t]he focus must be on whether the magistrate was provided with a factually complete picture of the Constitutional violation to justify application of the good faith exception." He further points out that "Bell knowingly failed to disclose to the magistrate information indicating that no one was inside the residence" and "downplayed her belief that the Defendant was intoxicated on PCP."

In any event, it appears that by omitting from the affidavit that she was dispatched to the scene for a medical call, witnesses observed Leonard fall down to the ground a substantial distance from his residence, she commented that he smelled like PCP, and she and her partner voiced their suspicions that Leonard was on drugs and had overdosed, Bell downplayed the indicia of drug use

---

[2] Judge Stetson pointed out, and this court agrees, that:

> [A]n objectively reasonable officer would have believed, based upon the following facts at the scene, that the Defendant was high on PCP and stumbled out of his messy home in an intoxicated state: the 911 medical/welfare call; the Defendant fell down and was thrashing around on the ground and pavement causing small scrapes; the Defendant was not responding verbally; the Defendant smelled like PCP; the Defendant was not located at his home, there was no answer at the door when the officers knocked; and there was no movement or noise detected through the cracked door.

(#59, 19-20).

in an effort to make the entry into Leonard's home seem reasonable. Moreover, by omitting the facts that she and Noyola knocked on Leonard's front door, there was no answer or any sounds emanating from the residence, and there was a broken coffee table purportedly viewable through the cracked door, it appears that Bell was understating the evidence indicating that there was no one in Leonard's home. Consequently, Bell seems to have been somewhat disingenuous in recounting the events leading up to the initial entry into Leonard's home. Although the Government contends that there are reasons independently justifying each of the above omissions, it does not assert that if all of "these omissions were included in the affidavit, a different picture of the events that transpired" at Leonard's home would not "have emerged to the magistrate." *United States v. Brown*, 230 F. Supp. 3d 513, 533 (M.D. La. 2017). Nor would such an argument be persuasive. Rather, had each of these omissions been included in Bell's affidavit, it is likely that "the magistrate would have been aware of the constitutional violation that took place as a result of the officers' warrantless entry into [Leonard's] residence." *Id*. Thus, the court finds that Judge Stetson correctly determined that Bell knowingly omitted facts that misrepresented the constitutional violation to the magistrate.

Finally, the Government argues that Judge Stetson "erred in failing to address . . . whether 'the benefits of deterrence outweigh the costs.'" Although Judge Stetson stated that "the suppression of this evidence serves the interest of deterring future constitutional violations," (#59, 22), the Government contends that she failed to discuss the costs of such an exclusion. Moreover, the Government "object[s] to the magistrate judge's finding that exclusion under these circumstances serves the interest of deterring police misconduct," and asserts that "what happened in Crockett, Texas, was a testament to the goodness of police officers." Further, the Government

5

contends that, "if anything, such conduct should be encouraged[.]"  The court, however, disagrees.

In this vein, Leonard retorts that, at the suppression hearing, the officers testified that it is their practice, after encountering an intoxicated individual, to find out where that person lives and sometimes enter his or her home.  For example, during Bell's cross-examination, in response to Leonard's attorney asking her if, after she finds out where an intoxicated person lives, it is her "practice to go inside their homes" if no one is there, she stated:  "It depends on the scenario.  It's hard to answer, sir."  (#61, 45).  Later, during Noyola's cross-examination, after establishing that it is also his practice to find out where an intoxicated person lives, Leonard's attorney asked Noyola if it was his "standard practice to go to the person's house."  *Id*. at 79-80.  Noyola responded that he ordinarily goes "to the residence to find out where they come [sic] from and see if they have any kind of medical history or anything or if they have a family resident [sic] there at the location."  *Id*.  Then, when asked if he goes inside a person's home when there is no answer to his knocking, Noyola responded that "I would make sure—just to clear the residence if the door is open.  If the door is not open, I'm not going in."  *Id*. at 80.[3]  Leonard maintains that "[i]t is simply beyond the pale that officers from two different law enforcement agencies would espouse

---

[3] During Noyola's cross-examination, the following exchange also occurred:

Q. Okay. That's probably objectionable for me to ask what you think.  Is it your—is it—is it the sheriff's office's policy if they see an open door to always go inside? An open door to a residence?
A. We go into residences if the door is open just to make sure there's nobody else that's harmed in there and just clear it.  We're not searching because we don't have a search warrant.  Make sure no individuals or anybody else is hurt and then we walk right back out.

(#61, 80-81).

such a cavalier attitude toward warrantless entries into the homes of the citizens they are sworn to protect," and avers that "[s]uch patently unconstitutional police practices certainly can be, and must be, deterred."

To be sure, when the exclusionary rule is applied, it is not without some costs to society. *Herring v. United States*, 555 U.S. 135, 141 (2009) ("The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" (quoting *Leon*, 468 U.S. at 908)). Accordingly, "the exclusionary rule applies only 'where its deterrence benefits outweigh its substantial social costs.'" *United States v. Guia-Lopez*, No. 22-50234, 2023 WL 5236764, at *7 (5th Cir. Aug. 15, 2023) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). Here, the suppression of evidence seized from Leonard's home "serve[s] the interest of deterring future constitutional violations," and that benefit significantly outweighs its societal cost. *See Massi*, 761 F.3d at 532. For instance, the suppression of evidence in this case will likely "deter future constitutional violations by sending a clear message that officers must articulate sincere and reasonable exigent circumstances to justify crossing that sacred threshold without a warrant" and by "conveying that officers may not sanitize an unconstitutional and unlawful search by obtaining a warrant through the misrepresentation of the facts surrounding the unlawful search to a magistrate." *Brown*, 230 F. Supp. 3d at 535.

Accordingly, it is ORDERED that Judge Stetson's Report and Recommendation (#59) is ADOPTED. Leonard's Amended Motion to Suppress Evidence (#48) is GRANTED, and all evidence seized as a result of this constitutional violation is suppressed.

SIGNED at Beaumont, Texas, this 13th day of October, 2023.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE